SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
JUSTIN R. BERNBROCK (*pro hac vice* admission pending)
CATHERINE JUN (*pro hac vice* admission pending)
ROBERT B. McLELLARN (*pro hac vice* admission pending)
321 North Clark Street, 32nd Floor
Chicago, Illinois 60654
Telephone: 312.499.6300
Facsimile: 312.499.6301
Email:     jbernbrock@sheppardmullin.com
           cjun@sheppardmullin.com
           rmclellarn@sheppardmullin.com

JENNIFER L. NASSIRI, SBN 209796
ALEXANDRIA G. LATTNER, SBN 314855
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067-6055
Telephone: 310.228.3700
Facsimile: 310.228.3701
Email:     jnassiri@sheppardmullin.com
           alattner@sheppardmullin.com

Proposed Counsel to Debtors and
Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

| | |
|---|---|
| In re: | Lead Case No.: 2:23-bk-12359 |
| BEVERLY COMMUNITY HOSPITAL ASSOCIATION, dba BEVERLY HOSPITAL (A NONPROFIT PUBLIC BENEFIT CORPORATION), *et al*,[1] | Jointly administered with: Case No: 2:23-bk-12360 Case No: 2:23-bk-12361 |
| Debtors, | Chapter 11 Case |
| ☒ Affects all Debtors | **DECLARATION OF ALICE CHENG IN SUPPORT OF CHAPTER 11 PETITIONS AND EMERGENCY FIRST DAY MOTIONS** |
| ☐ Affects Beverly Community Hospital Association | |
| ☐ Montebello Community Health Services, Inc. | Date:     April [•], 2023 Time:     TBD Judge:    Hon. Sandra R. Klein |
| ☐ Beverly Hospital Foundation | Place:    Zoom.Gov – or - Courtroom 1575 255 E. Temple St. Los Angeles, CA 90012 |

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are:  Beverly Community Hospital Association d/b/a Beverly Hospital (6005), Montebello Community Health Services, Inc. (3550), and Beverly Hospital Foundation (9685).  The mailing address for the Debtors is 309 W. Beverly Blvd., Montebello, California 90640.

-1-

SMRH:4873-9625-8392

Declaration Re First Day Motions

I, Alice Cheng, under penalty of perjury, declare as follows:

I am the President and Chief Executive Officer ("CEO") for each of the debtors and debtors in possession: Beverly Community Hospital Association d/b/a Beverly Hospital (the "Hospital" or "Beverly Hospital"), Montebello Community Health Services, Inc. ("Montebello Health") and Beverly Hospital Foundation ("Beverly Foundation," and together with Beverly Hospital and Montebello Health, collectively, the "Debtors"). I joined Beverly Hospital in 2001 serving as Chief Operations Officer ("COO") and Vice President of Business Development and Marketing. In January of 2014, I became the interim President and CEO, and thereafter was promoted to President and CEO in January 2016.

I have over 32 years' of experience working in the healthcare industry and extensive senior-level experience in the not-for-profit healthcare industry. Prior to joining Beverly Hospital, I served as the associate administrator of business development for Tenet Health Care System in El Monte, California.

I have a Bachelor of Arts in English Literature from the National Chengchi University, Taiwan, and a Master of Arts in Public Relations from the University of Southern California. I am a Board Certified Fellow of the American College of Healthcare Executives.

In my capacity as the Debtors' CEO, I am generally familiar with the Debtors' business, day-to-day operations, financial affairs, and books and records. I submit this declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and certain motions filed today.

Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. I am over the age of eighteen and authorized to submit this declaration on behalf of the Debtors. If called upon as a witness, I could and would testify competently to the facts set forth in this declaration.

I make this declaration to apprise the Court and parties in interest of the circumstances compelling the Debtors to commence these chapter 11 cases and in support of the First Day Motions (as defined below).  To enable the Debtors to minimize the adverse effects of these chapter 11 cases on their business, the Debtors have requested various forms of relief in a number of applications and motions (each a "First Day Motion," and, collectively, the "First Day Motions").  The First Day Motions seek relief intended to maintain the Debtors' business operations; to preserve value for the Debtors, their stakeholders, and other parties in interest; and, most importantly preserve Beverly Hospital for the benefit of the communities it has served for nearly seventy-five years.

## I.

### Introduction

For decades, Beverly Hospital has been a beacon of hope and security in Montebello, offering critical healthcare services and essential jobs to its local community that is predominantly Latino. The hospital serves an area where half of the population lives under the 200% poverty line and is without private health insurance.  Beverly Hospital's mission has and remains to bring the highest quality of care to meet its community members' needs. The hospital's care extends far beyond its beds, including public health programs and education.  Beverly Hospital provides emergency services as well as a broad range of inpatient and outpatient care to support those living with long-term illnesses like diabetes and cancer. It is located in the City of Montebello and serves as a safety net hospital for Pico Rivera, Monterey Park, El Monte, Whittier, East Los Angeles and surrounding communities.

Beverly Hospital seeks bankruptcy protection through the chapter 11 process to ensure that the community area residents do not lose their local hospital as it faces the impossible: caring for those unable to pay or without health insurance as the cost of care increases and government reimbursements stagnate. Since the Covid-19 pandemic, Beverly Hospital has experienced accelerating expenses and costs that are unsustainable. Industry-wide and in California specifically, hospitals have experienced major increases in labor costs due to a shortage in nursing staff and increases in wages.  Due to inflation and supply shortages, the cost of medical supplies increased by approximately 21%, the cost of most medications by 40%.  Meanwhile, Diagnosis Related

SMRH:4873-9625-8392

Declaration Re First Day Motions

Groups ("DRGs") and All Patient Refined DRGs base rates—patient classification schemes that ultimately determine payment for Medicare and Medi-Cal beneficiaries—have not adjusted to accommodate such increases.  Moreover, Medi-Cal supplemental payment programs, such as the Disproportionate Share Hospital ("DSH") and Quality Assurance Fees ("QAF") from specified providers, are being diluted because of Medi-Cal expansion eligible days.  In fact, Beverly Hospital experienced a $7 million reduction in DSH and QAF for the 2023 fiscal year alone.

An undeniable reality is that safety net hospitals in California have suffered severe financial distress in recent years:  A meteoric rise in labor and medical supply costs—while Medicare and Medi-Cal base rates have failed to adjust to absorb such increases.  More than half of California's hospitals were projected to have negative margins through 2022.[2]  Since 2020, Beverly Hospital has ended each fiscal year in the red; in 2022, it burned over $25 million of cash.  It is the patients who ultimately suffer the most—left without a community haven that provides vaccinations, emergent medical attention, education for new moms, or an in-patient bed that is not far from home. That more than 90% of Beverly Hospital's patient population relies on government payors makes its financial situation more dire.

Beverly Hospital must address its severe financial distress through a formal restructuring process to keep its doors open. When an area hospital in a low-income and underserved community suddenly closes, it strips employees of an income and health insurance, impacts ancillary community businesses like pharmacies and clinics, and puts an even greater burden on the neighboring facilities that must meet the increased demand for care created by the displaced patients.

In an attempt to preserve its ongoing operations, Beverly Hospital earnestly engaged in discussions with potential buyers that had shown interest in the past or with which I had a professional relationship.  Between August 2021 and February 2023, the Debtors negotiated potential mergers or affiliations with three separate hospital systems.  Two of the counterparties

---

[2]   The Current State of Hospital Finances: Fall 2022 Update, KaufmanHall, available at https://www.aha.org/system/files/media/file/2022/09/The-Current-State-of-Hospital-Finances-Fall-2022-Update-KaufmanHall.pdf.

Declaration Re First Day Motions

ceased negotiations because of the Debtors' overwhelming debt burden, their disproportionate share of Medicaid/Medi-Cal patients and the onerous review process imposed by the State's Attorney General. On October 16, 2022, the Debtors publicly announced, via posting to the EMMA website, their entrance into a letter of intent with Adventist Health System/West to pursue an affiliation agreement (the "Adventist Announcement").

Following the Adventist Announcement, in December 2022, Adventist Health System/West, Beverly Hospital and Montebello Community entered into an affiliation agreement that contemplated that Beverly Hospital would become a member hospital of Adventist Health and come under its control, and that Adventist Health would become the sole corporate member of Montebello Community. That same month, Beverly Hospital sent Robert Bonta, Attorney General of California, notice of the proposed affiliation. Adventist Health then sought assurances from the Office of the Attorney General that its review and consent process would be waived. The Attorney General and his staff did not oblige. Given the Debtors' liquidity position and the burdensome conditions that are typically imposed by the Attorney General, the parties terminated the affiliation agreement. On January 26, 2023, Beverly Hospital withdrew its notice of proposed affiliation from consideration of the Attorney General.

To sustain its operations and cash flow, Beverly Hospital immediately thereafter entered into a Management Services Agreement ("MSA") with AHMC Healthcare ("AMHC") on February 2, 2023. The MSA was publicly disclosed by Beverly Hospital via posting to the EMMA website on February 13, 2023 (the "AHMC Announcement"). In the AHMC Announcement, the Debtors outlined the economic terms of the proposed MSA with AHMC. Beverly Hospital's goals were to get an immediate cash infusion and gain access to AHMC's labor pool and specialty physicians network. Under the MSA, AHMC also warranted to enter into an asset purchase agreement. Beverly Hospital received a $3 million cash credit advancement on February 6, 2023. However, by the end of February, it became clear that realizing any cost savings would not be immediate, and the cash situation continued to deteriorate. Both parties terminated the MSA on March 15, 2023.

In addition to the informal sale process, the Debtors sent a letter to Assemblymembers and Senators of the State of California on or around March 16, 2023, requesting $8 million in financial

-5-

Declaration Re First Day Motions

aid to support Beverly Hospital's workforce to keep the emergency department available to the local community and continuing to provide acute care in the region.  No aid was approved. Simultaneously, the Debtors also implemented various cost cutting measures, including discontinuing service lines.  On March 16, 2023, Beverly Hospital publicly announced that to preserve critical healthcare access for the community and offset escalating costs, starting June 11, 2023, it would suspend the following services: maternal child health services, outpatient GI services, services at the women's pavilion, and the outpatient wound care center. In particular, the cost-cutting measures resulted in the suspension of eighteen (18) maternity beds and fifteen (15) pediatric beds, along with sixty-seven (67) staff members.

Simply put, hospitals like Beverly Hospital, in an underprivileged and underserved community, suffer from a combination of high overhead, decreased economics of scale, the absence of high-margin service lines, and thus, a much more precarious financial situation.  As stated above, I made every effort I could to find additional funding, while attempting to operate Beverly Hospital as efficiently as possible.

Prior to these chapter 11 cases, the Debtors engaged professionals to advise on its restructuring efforts. To that end, the Debtors retained Sheppard, Mullin, Richter & Hampton LLP ("Sheppard Mullin") as restructuring counsel on March 9, 2023 and Portage Point Partners, LLC ("Portage Point") as financial advisor and investment banker on March 20, 2023.  In consultation with Portage Point and Sheppard Mullin, the Debtors conducted a marketing process to seek a stalking horse purchaser and whether any party in connection with such a stalking horse bid would potentially provide bridge financing for short-term liquidity. The Debtors simultaneously ran a debtor-in-possession financing marketing process with their advisors to secure the best available financing terms to fund these chapter 11 cases.  The Debtors also engaged with their secured creditors to relay the current financial situation and impending filing and ask whether any of their existing lenders had a desire to extend debtor-in-possession financing.

The Debtors, with the assistance of their advisors, re-engaged with parties that had previously considered an affiliation or merger with Beverly Hospital. Specifically, the Debtors negotiated non-disclosure agreements and provided diligence in response to specific requests.

-6-

Declaration Re First Day Motions

Additionally, the Debtors launched a broader sale process to solicit interest from other potential buyers. Despite the Debtors' efforts, they were unable to execute a sale agreement (in principal or documented) prior to the Petition Date.

After exhausting strategic alternatives, Beverly Hospital enters chapter 11 in furtherance of its unending commitment to meet the challenges of its patients and community. It has secured $6,000,000 in interim financing to support continued operations of certain essential services and a sale process. The end goal is to find a buyer to keep Beverly Hospital solvent and solve its biggest challenges in managing costs to meet healthcare needs and offer expanded services. For the Debtors, regaining financial health is essential to coordinating care for its patients now and preparing for the future.

Unfortunately, the financial challenges Beverly Hospital faces are not unique. California's hospitals have greatly struggled since the pandemic and many are closing or on the verge of collapse. A closure of Beverly Hospital would have a catastrophic and devastating impact on the health needs of this community akin to what happened in Madera County, California. In January, Madera Community Hospital shut down all its services and clinics before filing for chapter 11 bankruptcy. The story and sequence of events leading up to Beverly Hospital's chapter 11 cases are similar to that of Madera Hospital: Madera, too, had served largely low-income patients for decades, and its financial struggles only worsened in the wake of the COVID-19 pandemic. Madera pursued a prepetition sale process that was unsuccessful as a result of numerous, financial impracticable conditions imposed by the California Attorney General, who asserts oversight authority in health care mergers involving nonprofit hospitals. Following the shutdown of Madera, at least two patients have died—one in an ambulance on the way to Fresno, and the other at home waiting for an ambulance.[3] In response, California Assemblywoman Esmeralda Soria sponsored a bill, Assembly Bill 412, that would provide funding to hospitals like Madera Community that have

---

[3] Assembly Bill Aims to Revive Madera Community Hospital, Others in Same Situation, Nic Garcia, ABC News, April 7, 2023, available at https://abc30.com/madera-community-hospital-state-loan-ab-412-struggling-hospitals/13097387/.

SMRH:4873-9625-8392

Declaration Re First Day Motions

closed or are on the verge of closing. The bill is currently making its way through the legislature. While promising, future legislative changes will come too late to save Beverly Hospital.

The Debtors' chapter 11 cases were precipitated by the need to avoid what happened in Madera. The Debtors seek the kind of reprieve that only this Court can provide—the breathing room of the automatic stay and an expedited sale of the hospital free and clear of certain interests, including the California Attorney General's notice and consent rights.  A sale process that is overseen by this Court will enable the Debtors to save Beverly Hospital and maintain the high quality of healthcare it provides to a community in desperate need of care.  Beverly Hospital filed these cases to keep its doors open and to continue to provide medical care to a vulnerable community; to preserve hundreds of skilled healthcare jobs; and to avoid the fate of other similarly situated community hospitals.

To familiarize the Court with the Debtors, their collective business enterprise, the circumstances precipitating these chapter 11 cases, and the relief the Debtors are seeking in those certain motions and applications filed contemporaneously herewith, the remainder of this declaration is organized as follows:

- **Part II** provides a general overview of the Debtors' history and operations;
- **Part III** provides an overview of the Debtors' prepetition corporate and capital structure;
- **Part IV**, along with the exhibit referenced therein, sets forth the evidentiary basis for the relief requested in each of the emergency first day pleadings.

## II.

## Hospital's History and Operations.

Established in 1949, Beverly Hospital is a 202-bed general acute care hospital located in historic Montebello on a street with its namesake.  As a safety net hospital, it draws from nearby residents in Montebello, Pico Rivera, Monterey Park, El Monte, Whittier, and East Los Angeles. In 1974, Beverly Hospital founded the Beverly Foundation to raise funds for the hospital.

Over the decades, Beverly Hospital has become a reliable community partner—not just a medical institution.  Free immunizations drives are held monthly for newborns and children up to

SMRH:4873-9625-8392

Declaration Re First Day Motions

age 18.  Maternity classes, both in English and Spanish, are held at the hospital campus—as are breast cancer support groups, glucose screenings at the nearby senior center, and teen and children fitness classes at the local YMCA.  At the height of the Covid-19 pandemic, Beverly Hospital was on the front line; it treated approximately 100 Covid-19 patients per day.  An increase of 15 licensed Emergency Room beds made the difference in saving lives during the unprecedented health crisis.

Over 80% of households in Montebello speak a language other than English—largely attributable to the city's Latino, Armenian, and Japanese populations.  And nearly 50% of households live below 200% of the Federal Poverty Level, with over one-third of adults without a high school diploma or its equivalent.



Beverly Hospital strives to meet the needs of this extremely vulnerable population.  The hospital administers healthcare *regardless of a patient's insurance status or ability to pay*.  As a result, 91% of Beverly Hospital's inpatient days are paid by government programs: 48% is paid by Medicare and 43% by Medi-Cal. The remainder of patient revenues consists of 6% commercial HMOs, 1% commercial insurance, and 2% from charitable support and self-paying patients.

-9-

Because the vast majority of Beverly Hospital's revenue depends on Medicare and Medi-Cal payments, Beverly Hospital's financial well-being deteriorated as the cost of labor, medical supplies and medicines have dramatically increased and Medicare and Medi-Cal reimbursements fell below the cost of care—and significantly lower than private insurance. Also, since the industry-wide nursing shortage began several years ago, Beverly Hospital has turned to traveling nurses and continue to pay above market rates—to the financial detriment of Beverly Hospital.



The hospital provides a full range of inpatient and outpatient care, including in the following service areas:

- Emergency Care Center
- Cardiac Care
- Intensive Care
- Medical and Surgical Services
- Radiology Diagnostic Services
- Senior Services

-10-

Declaration Re First Day Motions

In recent months, Beverly Hospital made the difficult decision to suspend 33 beds—18 in the Maternity department and 15 in Pediatrics. This means that Beverly Hospital will no longer provide labor and delivery or postpartum care, and children will not be admitted as inpatients. These closures will have a detrimental impact on patients as well as result in layoffs for 66 nurses.

### III.

### The Debtors' Prepetition Corporate and Capital Structures.[4]

The Debtors are nonprofit public benefit corporations organized under the laws of the State of California. The governing Board of Directors for Beverly Hospital mirrors the Board of Directors for Montebello Health. Montebello Health is a California nonprofit corporation organized pursuant to the Nonprofit Corporation Law of the State of California (the "Nonprofit Code"). Beverly Hospital is the sole corporate member of Beverly Foundation, although the Beverly Foundation is governed by its own, separate Board of Trustees. Each of the Debtors are exempt from federal income taxation as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986.

The Debtor entities work in concert to accomplish the shared charitable mission of providing compassionate and quality healthcare to the community. Montebello Health operates exclusively for the benefit of Beverly Hospital and its affiliates, and primarily owns and operates real estate assets comprising medical office buildings, healthcare facilities, residential property, and undeveloped land.

The Beverly Foundation engages in fundraising and the administration of donations for the benefit of Beverly Hospital patients and its programs, services, and patients. As of the Petition Date, the Beverly Foundation holds approximately $1.6 million in restricted funds and assets from donations.

As of the Petition Date, and as summarized in the table below, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal and interest amount of approximately $65.0 million.

---

[4]    A detailed depiction of the Debtors' corporate structure as of the Petition Date is attached hereto as **Exhibit A**.

| Obligation | Indenture Trustee/Lender | Maturity | Total Amount of Principal Outstanding on Petition Date |
|---|---|---|---|
| Series 2015 Revenue Bonds | U.S. Bank, N.A. | 2/1/2045 | $35,620,000 |
| Series 2017 Revenue Bonds | U.S. Bank, N.A. | 2/1/2048 | $19,400,000 |
| Revolving Loan | Hanmi Bank | 1/1/2024 | $10,000,000 |
| | | Total | $65,020,000 |

The Debtors, as borrowers, and U.S. Bank, National Association, as master trustee (the "Master Trustee"), entered into that certain Master Trust Indenture, dated as of December 1, 2015 (including all supplemental indentures issued in connection therewith, as amended and supplemented, the "Master Trust Indenture").

Prior to the Petition Date, the California Statewide Communities Development Authority issued revenue bonds on behalf of Beverly Hospital (the "Authority").

**Series 2015 Revenue Bonds.** The Debtors entered into (i) the First Supplemental Master Indenture, dated as of December 1, 2015, between Beverly Hospital, as Obligated Group Representative, and the Master Trustee (the "First Supplemental Master Indenture") and (ii) into that certain Loan Agreement, dated as of December 1, 2015, between the Authority, and Beverly Hospital (the "2015 Loan Agreement"). Pursuant to that certain Bond Indenture, dated as of December 1, 2015, between the Authority and U.S. Bank National Association, as trustee thereunder, the Authority authorized the issuance of the California Statewide Communities Development Authority Revenue Bonds (Beverly Community Hospital Association), Series 2015 pursuant to the Master Trust Indenture, in an aggregate principal amount of $39,725,000 (the "Series 2015 Revenue Bonds") and lent the proceeds of the Series 2015 Revenue Bonds to the Debtors pursuant to the 2015 Loan Agreement to finance construction, improvement, renovation and/or equipping the Debtors' health facilities.

The Series 2015 Revenue Bonds are secured by certain real property assets, gross receivables, and general intangibles. The Series 2015 Revenue Bonds were issued with a coupon rate of 4.0-5.0% with serial maturity dates from February 2019 through 2045.

**Series 2017 Revenue Bonds.** On May 1, 2017, the Debtors entered into that certain Second Supplemental Master Indenture, between Beverly Hospital, as Obligated Group Representative, and

Declaration Re First Day Motions

the Master Trustee, Beverly Hospital, as Obligated Group Representative. On May 1, 2017, pursuant to that certain Bond Indenture dated as of May 1, 2017, between the Authority and U.S. Bank National Association, as trustee thereunder, the Authority offered California Statewide Communities Development Authority Revenue Bonds (Beverly Community Hospital Association), Series 2017 (the "Series 2017 Revenue Bonds") in an aggregate principal amount of $19,840,000. The Debtors entered into that certain Loan Agreement, dated as of May 1, 2017, between the Authority, and Beverly Hospital (the "2017 Loan Agreement") specifying the terms and conditions of the loan by the Authority to Beverly Hospital of the proceeds of the Series 2017 Revenue Bonds to provide for further financing and the payment by Beverly Hospital to the Authority of amounts sufficient for the payment of the principal of and interest on the bonds and certain related expenses.

The Series 2017 Revenue Bonds are secured by the same assets as the Series 2015 Revenue Bonds and are *pari pasu* to them.  The Series 2017 Revenue Bonds were issued with a coupon rate of 3.0-5.0% with serial maturity dates from November 1, 2021 through November 1, 2048.

***Hanmi Revolving Loan.***  Pursuant to that certain Revolving Loan Agreement dated as of August 1, 2019 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "Hanmi Revolving Loan") by and between Beverly Hospital, as Borrower, and Hanmi Bank, as Lender, Hanmi Bank agreed to provide a revolving loan with a maximum draw of $10 million to Beverly Hospital for the purpose of supplemental working capital as needed for its business.  On August 1, 2019, Beverly Hospital, as Obligated Group Representative. issued an Obligation pursuant to the Master Trust Indenture to secure the obligations of the Hanmi Revolving Loan relating to the extension of a revolving loan.  The Debtors drew down on the Hanmi Revolving Loan on August 20, 2019 for $1.4 million followed by approximately $8.6 million on August 28, 2019.  The total amount outstanding as of the Petition Date is $10 million, such that the commitments under the Hanmi Revolving Loan are fully drawn.

SMRH:4873-9625-8392

Declaration Re First Day Motions

**IV.**

**Evidentiary Support for First Day Motions.[5]**

Contemporaneously herewith, the Debtors filed a number of "first day" motions (the "First Day Motions") and are seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these chapter 11 cases. The First Day Motions seek authority to, among other things, ensure sufficient liquidity to run the Debtors' business, ensure the continuation of the Debtors' cash management systems, and allow for other business operations without interruption.  I believe that the relief requested in the First Day Motions is necessary to give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors, and most importantly, the Debtors' patients.

I am familiar with the content and substance of the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully implementing a chapter 11 strategy.  A description of the relief requested and the facts supporting each of the First Day Motions is detailed in **Exhibit B**, all of which constitute my further statements.

*[Remainder of page intentionally left blank]*

---

[5] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

SMRH:4873-9625-8392

Declaration Re First Day Motions

1    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

2    and correct to the best of my information, knowledge, and belief.

3    Executed on this 19th day of April, 2023, at Los Angeles, California.

4    Dated:  April 19, 2023

5

6

7    By    _____

8    Alice Cheng
     President & CEO
9    Beverly Community Hospital Association

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration Re First Day Motions

## Exhibit A

## Corporate Structure

Exhibit A to First Day Declaration





## **Exhibit B**

**Evidentiary Support for the First Day Motions**

Exhibit B to First Day
Declaration

## Evidentiary Support for First Day Motions

I.    **Debtors' Emergency Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to (a) Continue to Operate their Cash Management System, (b) Honor Certain Prepetition Obligations Related Thereto; (c) Maintain Existing Business Forms, and (d) Perform Intercompany Transactions, and (ii) Granting Related Relief (the "Cash Management Motion").**

The Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to (i) continue to operate their Cash Management System, (ii) honor certain prepetition obligations related thereto; (iii) maintain existing Business Forms in the ordinary course of business, and (iv) continue to perform Intercompany Transactions (as such terms are defined below or in the Cash Management Motion) consistent with historical practice; and (b) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within 21 days of the commencement of these chapter 11 cases to consider approval of the Cash Management Motion on a final basis.

The Debtors operate an intricate cash management system (the "Cash Management System"), which is illustrated on Schedule 1 attached to the Cash Management Motion.  The Debtors use their Cash Management System in the ordinary course to transfer and distribute funds and to facilitate payment to physicians, nurses, and staff needed to run certain essential hospital functions.  The Debtors' accounts payable and finance departments maintain daily oversight of the Cash Management System and implements cash management controls for entering, processing, and releasing funds.  Additionally, the Debtors' accounts payable and finance departments regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

The Debtors' Cash Management System facilitates the timely and efficient collection, management, and disbursement of funds used to keep the Hospital running.  The Debtors estimate that cash collections for the Cash Management System average approximately $10 million per month, which primarily consists of reimbursements from Medi-Cal and Medicare plans, capitation payments in connection with independent physician associations, and funds received from insurance providers.  Because of the nature of the Debtors' operations and the disruption to the

Exhibit B to First Day
Declaration

business that would result if they were forced to close their existing bank accounts, it is critical that the Debtors' Cash Management System remain in place on a postpetition basis.

As of the Petition Date, the Cash Management System includes a total of 63 bank accounts (collectively, the "Bank Accounts"), 30 of which are held with Hanmi Bank ("Hanmi"), 22 with Bank of the West, and 10 accounts with U.S. Bank, and one account with Bank of America ("BOA") (collectively, the "Cash Management Banks").

The Bank Accounts are identified on Schedule 2 of the Cash Management Motion.  The Cash Management System consists of the following primary accounts:

Beverly Hospital has the following bank accounts maintained at Hanmi:

- A main operating account (the "Main Operating Account");

- A payroll account that is used to disburse funds first to the third-party payroll processor, ADP, which then disburses to the Hospital's employees (the "BCHA Payroll Account");

- A money market account (the "Money Market Account");

- A patient refund account (the "Patient Refund Account");

- A general account that receives payments from insurance providers (the "General Account");

- A non-Medi-Cal receipt account (the "Non-Medi-Cal Receipt Account");

- An account to pay participating employees' dental plan benefits (the "BCHA Dental Plan Account");

- An account to pay participating employees' medical expense reimbursement plan benefits (the "BCHA 870 (MERP)");

- An account to hold paycheck deductions of employees who have elected to maintain a flexible spending account as part of their health benefits (the "FSA Checking Account");

Exhibit B to First Day
Declaration

- Three accounts held to fund and manage workers' compensation claims (either, the "Self-Funded Workers' Comp Account" and two "Fully Insured Workers Comp Accounts"); and

- Two pledge accounts for Beverly fundraising (the "Pledge/Type Certificate" accounts).

Beverly Hospital has the following capitation accounts maintained at Hanmi:

- A management fee account;

- A capitation account for AHC Health Net;

- A capitation account for Imperial Health Holdings;

- A capitation account for the Associated Hispanic risk pool;

- A capitation account for the Accountable Health Care IPA;

- A capitation account for the Health Net Clearing; and

- A capitation account for Molina health care.

**Montebello Health**

Montebello Health has the following bank accounts maintained at Bank of the West:

- A general checking account to collect ground lease payments from Beverly Hospital for its use of the surgical center (the "Beverly Surgical Center General Checking Account");

- A general account;

- An account that receives rental income from certain investment properties (the "Montebello Investment Properties"); and

- An account that receives rental income from Beverly Medical Plaza (the "Beverly Medical Plaza General Account").

Like other hospitals, Beverly contracts with certain insurance providers to provide hospital and healthcare services on a risk adjusted basis for certain patient populations. In these capitation arrangements, Beverly Hospital receives monthly fixed payments per patient directly into dedicated bank accounts at Hanmi Bank. These "capitation accounts" receive "capitation

payments" and, in exchange, Beverly Hospital provides medical services to these patients. From the capitation accounts, funds are later disbursed to pay network medical management, certain claims, MSO Network Medical Management. When all outstanding claims are deemed reconciled by the Hospital and the insurance provider, Beverly Hospital may sweep the remaining funds into its Main Operating Account. Working with different reimbursement models of large insurance providers and government programs makes it impracticable to close these accounts and open new accounts. It is critical that Beverly Hospital maintain timely payment of claims and receive timely capitation payments from insurance providers to ensure that the Hospital can continue to provide critical healthcare services to its patients.

The Debtors also seek Court-authority to open new bank accounts pursuant to the Debtor's proposed Secured Superpriority Debtor-in-Possession Loan Agreement (the "DIP Agreement"), by and between Beverly Hospital and Montebello Health, as borrowers and HRE Montebello, LLC, as lender (the "Lender"). Under the DIP Agreement, to further secure and segregate its collateral, the Lender is requiring that Debtors Montebello Health and Beverly Hospital establish the following three new bank accounts as defined in the DIP Agreement: two Clearing Accounts, which will be established to receive all amounts that Borrower Montebello Health and Beverly Hospital, respectively receive from rental income, and one Security Deposit Account, which will hold all Prepaid Revenues. *See* DIP Agreement § 3.5. All three of the accounts will be non-interest bearing demand deposit accounts in the name of Borrower and Lender (as pledgee) and will be secured by a deposit account control agreement in favor of the Lender. Additionally, to hold the proceeds from the DIP loan, the Debtors will establish a fourth non-interest bearing demand deposit account that will hold the proceeds from the DIP Agreement. Funds held in this demand deposit will be unencumbered and not subject to any liens or deposit control agreement in favor of the Lender. Finally, pursuant to the DIP Agreement, as further detailed in paragraph 14(c)

of the interim order approving the DIP Agreement, the Debtors shall open a fifth account to fund a Funded Reserve Account for the sole benefit of professionals.

Opening these above-mentioned accounts pursuant to the DIP Agreement will allow for additional protection of the Lender's security interest and will assist the Debtors with keeping rental income segregated from other operating expenses. When established, Montebello Health will close all of its current Bank Accounts and transition to solely using the new accounts to be established pursuant to the DIP Agreement.

Prior to the Petition Date, in the ordinary course of their business, the Debtors exchanged goods and services, and engaged in intercompany financial transactions, with each other (collectively, the "Intercompany Transactions"). As detailed in the Cash Management Motion, the Debtors manage their cash receipts and cash disbursements through the Cash Management System. The Debtors track all fund transfers in their accounting system and can ascertain, trace, and account for all Intercompany Transactions and will continue to maintain records of such transactions. Because payments or disbursements by one Debtor entity made or collected on behalf of another would give rise to an asset for one entity and a liability for another, the Debtors track the Intercompany Transactions and the related Intercompany Claims. Upon information and belief, the Debtors do not settle Intercompany Transactions on a cash basis.

The Debtors maintain robust controls relating to the Cash Management System. On a daily basis, members of the Debtors' finance department (the "Finance Department"), including the myself, review reports on the Debtors' cash balances and disbursements. Various levels of authorizations are required for the release of disbursements, with all material disbursements requiring approval from the controller or chief financial officer. On a weekly basis, the members of the Finance Department, including the controller and/or chief financial officer, review accounts payable and approve items for payment. Occasionally, off-cycle payments are necessary (i.e., outside the Debtors' standard weekly review process), and are reviewed on a one-off basis by the controller and/or chief financial officer prior to payment being released. In the rare event that the Debtors' reports and Bank Account records do not match, the Finance Department works with the

banks, insurance providers, or other third parties to resolve such discrepancies quickly and efficiently.

## A. Bank Accounts

Certain of the Debtors main Bank Accounts are further described in the following table:

| Bank Accounts[6] | Account Description |
|---|---|
| **Bank Accounts** | |
| **Main Operating Account**<br>(595) Hanmi | The Debtors use the Main Operating Account to fund operating expenses incurred by the Beverly Hospital and Montebello Health. The Main Operating Account receives funds from patients and third-party payors. The Debtors make transfers to the various other Bank Accounts to fund payroll and other employee benefits. |
| **Payroll Account**<br>(597) Hanmi | The Main Operating Account is manually debited to fund the Payroll Account for biweekly payroll expenses, which are funded through the Debtors' third-party payroll processor, ADP, which in turn pays employees and remits necessary withholdings and taxes. |
| **Money Market Account**<br>(676) Hanmi | Excess Cash in Main Operating Account is transferred to this Money Market Account to earn interest. |
| **Patient Refund Account**<br>(641) Hanmi | The Patient Refund Account maintains  funds to be distributed to patients on account of any refunds owed after the Hospital receives reimbursement funds from Medi-Cal, Medicare, or insurance to pay for the patient's cost of care. The Hospital processes patient payments through the Main Operating Account, and then reimburses patients through the Patient Refund Account. |
| **General Account**<br>(7284) Hanmi | The Hospital maintains the General Account to receive payments from insurance providers on account of patient cost of care. |
| **Non Medi-Cal Receipt Account**<br>(668) Hanmi | The Non-Medi-Cal Receipt Account was used to reserve Covid-19-realted funds for "Employer FICA" tax deferral payment  The account has since been repurposed for other general operating expenses, e.g., to facilitate large disbursements (e.g., bond coupon payments, quality assurance fees, etc.).. |
| **FSA Checking Account**<br>(544) Hanmi | The FSA Checking Account is funded by the employees who elect to fund a flexible savings account and matched funds by the Hospital from the Main Operating Account. All funds made to this account are considered restricted and are paid to the Debtors' third-party benefits administrator, IGOE, to process and settle claims and funds withdrawn by the employees for eligible healthcare expenses. |

---

[6]    A complete list of all Bank Accounts is attached hereto as **Schedule 2**.

SMRH:4873-9625-8392                                                    Exhibit B to First Day
Declaration

| | |
|---|---|
| **BCHA Dental Plan Account**<br>(455) Hanmi | The BCHA Dental Plan Account is maintained to fund the employees' dental plan benefits. These are considered restricted funds that are held on account of eligible Hospital's employees who have opted into a dental coverage. |
| **MERP Account**<br>(455) Hanmi | The MERP Account is used in conjunction with the zero-balance account at Bank of America to facilitate payments to the Debtors' professional benefit administrator, Catilize Health, for the employees' medical expense reimbursement program ("MERP") |
| **Bank of America Account** | The Bank of America Account, which is required by Keenan & Associates, is an intermediary account used for funds distributed to Keenan & Associates for the Employee Medical claims. |
| **Workers' Comp Accounts**<br>(617, 625, and 633) Hanmi | The three various Workers' Comp Accounts are maintained to fund various workers' compensation claims. The Hospital funds such accounts through their Main Operating Account and then funds amounts necessary to fund each category of workers compensation claims, including self-funded workers (617) and fully insured workers (625 or 633). |
| **Beverly Surgical Center General Checking Account**<br>(714) Hanmi | Montebello Health maintains the Beverly Surgical Center General Checking Account to receive and manage ground lease payments from Beverly Hospital for use of the medical offices building. Funds from this account are also used to cover property taxes for the property. |
| **Montebello Investment Properties Account**<br>(722) Hanmi | The Montebello Investment Properties Account receives payment on account of rental income from Montebello's real estate tenants. These funds are used to pay property taxes and utilities to maintain the properties. |
| **Restricted Foundation Accounts**<br>(289, 235, *02, and *1-8) BOW | The Beverly Foundation maintains various segregated accounts that maintain donated funds from various foundations and general donors. These funds are considered restricted under the applicable non-profit law. |
| **The Beverly Hospital Foundation Money Market Account**<br>(*137) BOW | The Money Market Account allows the Beverly Foundation to earn interest on donated funds. The Beverly Foundation has received donations in the form of investments, which are held in The Beverly Hospital Foundation Money Market Account. By their nature, these accounts fluctuate with the stock market, but the Debtors do not actively trade or invest the funds. |
| **Pledge / Type Certificate Accounts**<br>(657 and 606) Hanmi | As added security for the letters of credit supporting the Debtors' self-insured workers compensation plan, the Debtors Pledge/Type Certificate Accounts hold certificates of deposit amounting to approximately $2.0 million. |
| **Capitation Accounts** | |
| **Management Fee Account**<br>(552) Hanmi | The Management Fee Account Capitation is a risk account. For a monthly fee, the third-party network medical |

Exhibit B to First Day
Declaration

|  | management company manages the account and helps reconcile capitation payments. |
|---|---|
| **AHC Health Net Capitation Account**<br>(692) Hanmi | ACH HealthNet Capitation Account holds capitation payments pursuant to the capitation agreement with HealthNet. |
| **Imperial Health Holdings – Humana Account**<br>(897) Hanmi | Imperial Health Holdings–Humana Account holds capitation payments until claims are settled pursuant to the agreement with Humana. |
| **Associated Hispanic IPA Risk Pool**<br>(095) Hanmi | Beverly Hospital uses the Associated Hispanic IPA Risk Pool account to pay out Health Net claims. |
| **Accountable Health Care IPA**<br>(706) Hanmi | Accountable Health Care IPA account holds capitation payments pursuant to the capitation until settled. |
| **HealthNet Deposits and Clearing Capitation**<br>(079) Hanmi | The HealthNet Deposits and Clearing Capitation account received funds from the HealthNet Deposits Clearing Capitation account and those funds are then swept into the Associated Hispanic IPA Risk Pool. |
| **SCCHN – Molina**<br>(486) Hanmi | The SCCHN – Molina account is a shared risk pool. |
| **Beverly MSO**<br>(765) Hanmi | Beverly Hospital plans to settle funds in this account and close this account postposition. |

On a monthly basis, the Debtors pay approximately $60,700 in service fees and other charges in connection with the maintenance of the Cash Management System (the "Bank Fees"). This includes a bank card processing fee, merchant service fee, and interest due on a letter of credit maintained at Hanmi Bank. The Debtors estimate that approximately $60,700 on account of Bank Fees will come due within 21 days.

As part of the Cash Management System, the Debtors provide three of their employees with access to purchase cards issued by Bank of the West (the "Purchase Cards") to be utilized for approved purchases and business expenses (the "Commercial Card Program"), including emergency supplies, transportation in limited situations for patients, and Foundation fundraising purposes. The Purchase Cards are paid monthly by check from the Main Operating Account. In order to maintain the Commercial Card Program, which is critical to the Debtors' ability to maintain ordinary course operations, the Debtors request authority to continue utilizing and making payments on account of the Commercial Card Program in the ordinary course of business on a postpetition basis.

Declaration

I have been advised that the *Guidelines and Requirements for Chapter 11 Debtors in Possession for All Cases Filed in the Central District of California* (the "U.S. Trustee Guidelines"), generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the Office of the United States Trustee (the "U.S. Trustee").  All of the Debtors' Cash Management Banks, Hanmi, Bank of the West, U.S. Bank, and BOA are authorized depositories under the U.S. Trustee Guidelines.  Further, all of the Bank Accounts are insured by the Federal Deposit Insurance Corporation ("FDIC"); however, the balances in certain of the Bank Accounts may exceed the insured threshold amounts.  Nonetheless, the Debtors believe that any funds that are deposited in the Bank Accounts are secure.

The Debtors respectfully submit that cause exists to continue to allow the Debtors to utilize the existing Bank Accounts.  The Debtors will work in good faith with the U.S. Trustee to resolve any concerns regarding the continued use of these Bank Accounts on a postpetition basis.

As part of the Cash Management System, the Debtors utilize preprinted business forms in the ordinary course of their business, including letterhead, purchase orders, invoices, and preprinted checks (the "Business Forms").  The U.S. Trustee Guidelines require that the Cash Management Banks print "Debtor-in-Possession" and the bankruptcy case number on checks issued after the Petition Date.

To minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases, the Debtors request that the Court authorize their continued use of all Business Forms in existence immediately before the Petition Date, without reference to the Debtors' status as debtors-in-possession.  If the Debtors exhaust their existing supply of checks during these chapter 11 cases, the Debtors will print or order checks with the designation "Debtor-in-Possession" and the corresponding bankruptcy case number.

I believe that the continuation of the Cash Management System, including with regard to the continued use of the Bank Accounts, payment of Bank Fees, maintenance of their existing

Business Forms and Books and Records, and engagement in the Intercompany Transactions, is vital to the Debtors' ability to operate effectively in these chapter 11 cases. Due to the complexity of the Cash Management System and the interconnected-nature of the Debtors' operations, any delay in granting the relief requested in the Cash Management Motion would severely disrupt the Debtors' operations at this critical juncture, imperil the Debtors' restructuring, and irreparably jeopardize the Debtors' ability to maximize the value of their estates for the benefit of all stakeholders.

I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

## II.   Debtors' Application for Entry of an Order Authorizing the Retention and Appointment of KCC as Claims and Noticing Agent (the "KCC 156(c) Retention Application").

Pursuant to the KCC 156(c) Retention Application, the Debtors seek entry of an order appointing Kurtzman Carson Consultants LLC ("KCC") as claims and noticing agent (the "Claims and Noticing Agent") for the Debtors in their chapter 11 cases effective as of the Petition Date, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' chapter 11 cases and granting related relief. As the Claims, Noticing, and Solicitation Agent, KCC would assume full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases.

I believe that the Debtors' selection of KCC to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interest of the estates. Moreover, based on all engagement proposals obtained and reviewed, I believe that KCC's rates are competitive and comparable to the rates charged by its competitors for similar services.

The Debtors anticipate that there will be thousands of persons and entities to be noticed in these chapter 11 cases. In light of the number of parties in interest and the complexity of the

SMRH:4873-9625-8392

Exhibit B to First Day
Declaration

Debtors' business, the Debtors submit that the appointment of a claims and noticing agent is in the best interests of the Debtors' estates and their creditors because it will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim. Accordingly, it is my opinion that the Court should approve the KCC 156(c) Retention Application.

II.     **Debtors' Emergency Motion for Entry of an Order (i) Authorizing the Debtors to Maintain, Renew, or Supplement Their Insurance Policies and Honor All Obligations In Respect Thereof, and (ii) Granting Related Relief (the "Insurance Motion").**

Pursuant to the Insurance Motion, the Debtors seek entry of an order: (a) authorizing the Debtors to maintain, renew, or supplement their insurance policies and honor all obligations in respect thereof; and (b) granting related relief. The requested relief includes paying all amounts arising in connection with the Insurance Policies, whether due and payable before, on, or after the Petition Date, and entering into new Insurance Policies in the ordinary course of business.

In the ordinary course of business, the Debtors maintain approximately 15 insurance policies, a schedule of which is attached the Insurance Motion as Exhibit B (collectively, the "Insurance Policies," and, individually each, an "Insurance Policy"), that are administered by various third-party insurance carriers (collectively, the "Insurance Carriers"). In addition to the Insurance Policies, the Debtors maintain workers' compensation policies that are also reflected in Exhibit B of the Insurance Motion, but for which relief is not sought in that motion. These Insurance Policies provide general liability, professional liability, excess liability, D&O, and property coverage, among others. All of the Insurance Policies are essential to the ongoing operation of the Debtors' business. The aggregate annual premium for the Insurance Policies is approximately $2,754,964, plus applicable taxes and surcharges.

The Insurance Policies are annual policies that renew throughout the year based on when the policy was originally purchased. The Debtors do not believe that any premiums are due on account of the Insurance Policies as of the Petition Date. The Debtors seek authority to maintain, renew, and/or supplement their Insurance Policies and to continue honoring all obligations in

respect thereof in the ordinary course of business to ensure uninterrupted coverage during the course of these chapter 11 cases.

Continuation and renewal of the Insurance Policies, and entry into new Insurance Policies, as needed, is essential to the preservation of the value of the Debtors' business and operations. Moreover, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtors' operations, including the United States Trustee for the Central District of California (the "U.S. Trustee") requirements that a debtor maintain adequate insurance coverage given the circumstances of its chapter 11 case. Accordingly, the Debtors request authority to maintain their existing Insurance Policies, pay prepetition obligations related thereto, and enter into new Insurance Policies in the ordinary course of business.

I believe that continuation and renewal of the Insurance Policies, and entry into new Insurance Policies, as needed, is essential to the preservation of the value of the Debtors' business and operations. Moreover, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the U.S. Trustee's requirements that a debtor maintain adequate insurance coverage given the circumstances of its chapter 11 case.

I believe that failure to receive the requested relief in the Insurance Motion at the outset of these chapter 11 cases would expose the Debtors to direct liability for payment of claims otherwise covered by the Insurance Policies, distract the Debtors from the vital task of stabilizing their business through this process, and disrupt the Debtors' operations at this important juncture. The relief requested in the Insurance Motion is necessary for the Debtors to operate their business in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders.

I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, I respectfully submit that the Insurance Motion should be approved.

-14-

**III.    Debtors' Emergency Motion for Entry of an Order (i) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (ii) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing  Services, (iii) Approving the Debtors' Proposed Procedures for Resolving  Additional Assurance Requests, and (iv) Granting Related Relief (the "<u>Utilities Motion</u>").**

Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders: (a) approving the Debtors' Proposed Adequate Assurance (defined herein) of payment for future utility services; (b) prohibiting Utility Companies (defined herein) from altering, refusing, or discontinuing services; (c) approving the Debtors' proposed procedures for resolving Adequate Assurance Requests (defined herein); and (d) granting related relief.

In connection with the operation of their businesses, the Debtors obtain electric, water, telecommunications, internet, waste removal and/or other similar services (collectively, the "<u>Utility Services</u>") from a number of utility companies (collectively the "<u>Utility Providers</u>," and each individually a "<u>Utility Provider</u>").

On any given business day, patients undergo surgical procedures and receive medical treatments for which sophisticated life-sustaining equipment powered by the Utility Services is essential.  While any interruption in Utility Services would certainly be very detrimental to the Debtors' business, any interruption of the Utility Services, no matter how brief, could be extremely harmful to the patients at the Debtors' facilities.  Uninterrupted Utility Services are essential to the Debtors' ongoing hospital operations and their ability to provide care to their patients.  Without Utility Services, the Debtors' operations will shut down and patients could be harmed.

To the best of the Debtors' knowledge, there are no defaults or arrearages of significance with respect to the Debtors' undisputed invoices for prepetition Utility Services, other than payment interruptions that may be caused by the commencement of these Chapter 11 Cases.  For the past twelve (12) months, the Debtors have, on average, paid approximately $280,000 per month on account of all Utility Services.  The Debtors estimate that their cost for Utility Services during these cases (excluding any deposits to be paid) will be approximately the same.

The Debtors intend to pay postpetition obligations owed to the Utility Providers in a timely manner.  Cash held by the Debtors, cash generated in the ordinary course of business, and cash

otherwise available to the Debtors will provide sufficient liquidity to pay the Debtors' Utility Service obligations in accordance with prepetition practice.

To provide additional assurance of payment, the Debtors propose to deposit $140,000 into a segregated account (the "Adequate Assurance Deposit"), which represents an amount equal to approximately two weeks of the Debtors' cost of Utility Services, calculated based on the Debtors' average utility expenses over the twelve-month period ending February 28, 2023.

The Adequate Assurance Deposit will be held in a segregated, debtor in possession bank account in the Debtors' name (the "Adequate Assurance Account") for the benefit of the Utility Providers for the duration of these chapter 11 cases and may be applied to any postpetition defaults in payment to the Utility Providers.  The Adequate Assurance Deposit will be held by the Debtors, and the Debtors' creditors will have no lien on any Adequate Assurance Deposit to the extent not returned to the Debtors pursuant to the terms set forth in the Order.

The Debtors submit that the Adequate Assurance Deposit and the Debtors' anticipated ability to pay for future utility services in accordance with prepetition practice in the ordinary course of business on a postpetition basis (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of section 366 of the Bankruptcy Code.

*Adequate Assurance Procedures*.  Severe consequences to the Debtors' business and operations that would result from any interruption in Utility Services.  But the Debtors recognize the right of the Utility Providers to evaluate the Proposed Adequate Assurance, if a Utility Provider believes additional adequate assurance is required, it may request such assurance pursuant to the following procedures (the "Adequate Assurance Procedures").

The Adequate Assurance Procedures set forth a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while allowing the Debtors to administer their chapter 11 estates without interruption.  More specifically, the Adequate Assurance Procedures permit a Utility Provider to object to the Proposed Adequate Assurance by serving an Adequate Assurance Request upon certain Notice Parties.  The Debtors,

SMRH:4873-9625-8392

in their discretion, may then resolve any Adequate Assurance Request by mutual agreement with the Utility Provider and without further order of the Court.  If the Adequate Assurance Request cannot be resolved by mutual agreement, the Debtors may seek Court resolution of the Adequate Assurance Request.

I believe that uninterrupted Utility Services are essential to the Debtors' ongoing business operations and hence, the overall success of these chapter 11 cases.  The Debtors' retail locations, distribution centers, and corporate offices require electricity, telecommunications, heat, water, waste management, and other Utility Services to operate. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations may be severely disrupted, and such disruption would jeopardize the Debtors' ability to manage their reorganization efforts.  Accordingly, it is essential that the Utility Services continue uninterrupted during these chapter 11 cases.

I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be granted.

**IV.    Debtors' Emergency Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to (a) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (b) Continue Employee Benefits Programs, and (ii) Granting Related Relief (the "<u>Wages Motion</u>").**

Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, reimbursable expenses, and other obligations on account of the Employee Compensation and Benefits Programs (as defined below) and (ii) continue to administer the Employee Compensation and Benefits Programs on a postpetition basis in the ordinary course of business and (b) granting related relief.

As of the Petition Date, the Debtors' workforce consists of approximately 481 full time, 79 part time, and 295 per diem employees (collectively, the "<u>Employees</u>").  The Debtors are

additionally served by medical staff of approximately 435 physicians, including surgeons, medical directors, on-call doctors, and physicians' assistants.

Fulltime and parttime employees are regularly scheduled to work every 14-day pay period; per diem employees, meanwhile, are used on an as-needed basis.  Notably, California mandates specific nurse-to-patient ratios; therefore, the Debtors' use of per diem employees ensures that the Debtors comply with those requirements.

The Debtors maintain the following compensation and benefits programs and pay various administrative fees and premiums in connection therewith (each as defined herein, and together, the "Employee Compensation and Benefits Programs"):

- Employee Compensation;

- Physician Fees;

- Incentive Program Obligations;

- Wage and Benefits Processing Fees;

- Withholding Obligations;

- Unemployment Obligations;

- Reimbursable Expenses;

- PTO Plans;

- Health Plans;

- Health Plan Administration Fees;

- Severance Program;

- Supplemental Retirement Program and Automobile Stipend;

- Other Benefits;

- Retirement Plans; and

- Workers' Compensation Programs.

The vast majority of Employees rely exclusively or primarily on the Employee Compensation and Benefits Programs to pay their daily living expenses and support themselves or their families.  Thus, Employees will face significant financial consequences if the Debtors are not

permitted to continue the Employee Compensation and Benefits Programs in the ordinary course of business. The Debtors seek to minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected. Consequently, the relief requested is necessary and appropriate.

Furthermore, in order to accomplish the Debtors' goals in these chapter 11 cases—namely, an expedited sale of Beverly Hospital—I believe that it is crucial that the Debtors minimize any adverse impact of the chapter 11 filing on the Debtors' workforce, as that could have a direct negative impact to patient care. A disruption to payment of the payroll, or to the continuing of employee programs in the Debtors' discretion, could cause employees to terminate their employment, be distracted from their duties, and could affect employee morale at a particularly critical time for the Debtors.

Specifically, by the Wages Motion, the Debtors seek authority, but not direction, to pay the following aggregate prepetition amounts on account of the Employee Compensation and Benefits Programs:

| Employee-Related Obligations | Interim Relief | Final Relief |
|---|---|---|
| Employee Compensation | $1,400,000 | $1,400,000 |
| Physician Fees | $900,000 | $900,000 |
| Incentive Program Obligations | $10,000 | $20,000 |
| Wage and Benefits Processing Fees | $15,000 | $15,000 |
| Withholding Obligations | $750,000 | $750,000 |
| Unemployment Obligations | $15,000 | $25,000 |
| Reimbursable Expenses | $10,000 | $10,000 |
| Health Plans | $500,000 | $500,000 |
| Prescription Drug Plans | $83,000 | $83,000 |
| Dental Plans | $22,000 | $22,000 |
| Vision Plans | $4,000 | $4,000 |
| Life Insurance | $12,000 | $12,000 |
| Medical Expense Reimbursement | $5,000 | $5,000 |
| Other Health Benefits | $10,000 | $10,000 |
| Health Plan Administration Fees | $71,000 | $71,000 |
| Supplemental Retirement Program and Automobile Stipend | $0 | $4,500 |
| DHCS Retention Program | $0 | $815,427 |
| Other Benefits | $12,000 | $12,000 |
| Retirement Plans | $21,000 | $21,000 |
| Workers' Compensation Programs | $60,000 | $60,000 |
| **Total** | **$3,900,000** | **$4,739,927** |

Exhibit B to First Day
Declaration

For the avoidance of doubt, the Debtors do not seek authority to pay any amounts in excess of the $15,150 per Employee statutory limit for prepetition priority claims accrued within the 180 days prior to the Petition Date.

I understand that Local Bankruptcy Rule 2014-1(a) requires that the Debtors serve Notices of Setting/Increasing Insider Compensation with respect to any of executives who qualify as "insiders" (as defined in section 101(31) of the Bankruptcy Code). Under the Wages Motion, the Debtors are only seeking authority to pay insider Employees their unpaid wage or salary obligations that have accrued on their behalf prior to the Petition Date provided that no objections to the Notices are received within the 15-day time period provided by the U.S. Trustee Guidelines.

**Employee Compensation.**

The Debtors pay Employees' wages and other compensation (excluding reimbursable expenses, non-insider Employee severance programs, and paid leave) on a bi-weekly basis (collectively, the "Employee Compensation"). Because the Debtors' Employees are paid in arrears, Employees will be owed accrued but unpaid Employee Compensation as of the Petition Date. Employee Compensation may also be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that Employees believe they should have been paid which, upon resolution, may reveal that additional amounts are owed to such Employees, or as a result of Employees holding uncashed paper paychecks as of the Petition Date. In 2022, the Debtors spent an average of approximately $3.6 million per month on Employee Compensation.

As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations owed to Employees is approximately $1.4 million on account of Employee Compensation, all of which will come due during the interim period.

**Physician Fees.**

Like in many hospitals, certain medical providers and department directors are contracted with Beverly Hospital—either as a sole proprietor or as part of a medical group. At Beverly, such providers include on-call physicians and other medical professionals, treating patients in a broad

-20-

range of specialties such as (i) cardiology, (ii) pediatrics, (iii) anesthesia, (iv) orthopedics, (v) urology, (vi) general surgery, and (xii) obstetrics. Meanwhile, the hospital's medical directors supervise and coordinate physicians and other medical staff in medical departments and programs, including, among others, (i) the Emergency Room, (ii) Pathology, (iii) Cardiology, (iv) Infectious Disease, (v) Obstetrics and Gynecology, (vi) Cardiothoracic Surgery, (vii) Interventional Cardiology, (viii) Gastroenterology, and (ix) Pulmonary Service. Department chairs and medical directors provide program quality, administrative oversight, and crucial risk management. In 2022, the Debtors spent an average of approximately $500,000 per month in compensation to physicians.

As of the Petition Date, the Debtors will owe approximately $900,000 with respect to physicians serving in these capacities (the "Physician Fees").

**Incentive Program Obligations.**

The Debtors historically have provided modest increases to hourly wages of non-insider Employees during Covid surges and staffing shortages (the "Combat Pay Increase") to encourage Employees to continue to work despite the challenges and risks. As of the Petition Date, the Debtors do not have any amounts that are due and owing for the prepetition period.

In order to incentivize the Employees to share in the effort to hire nurses, the Debtors have provided to non-insider Employees referral bonuses ("Referral Bonus," and with the Combat Pay Increase, the "Incentive Program Obligations"). Six months after the hire of an experienced registered nurse, the referring Employee receives the first half of the bonus, $1,000, and the second half, $1,000, upon the nurse's one year of employment. As of the Petition Date, ten Employees are eligible to receive the Referral Bonus.

**Wage and Benefits Processing Fees.**

The Debtors utilize the services of a third-party payroll processor, ADP, to process and disburse the Debtors' payroll. Based on data provided by the Debtors, ADP tallies the amounts necessary to fund payroll (including payroll taxes, withholdings and other deductions), debits the Debtors' account accordingly approximately two to four business days in advance of payroll and

-21-

disburses the funds to the Employees and third parties, as applicable, by electronic transfers or, on a few occasions by checks. At the same time, ADP invoices the Debtors for the payment of ADP's fees for processing payroll and related administration, (collectively, the "Payroll Processing Fees").  The average monthly amount of the Payroll Processing Fees is approximately $11,000, which are paid in arrears.  The Debtors do not believe that there are outstanding Payroll Processing Fees as of the Petition Date.

The Debtors also utilize the services of a third-party claims administrator, Igoe, to administer the claims under the Employees' flexible spending accounts and any COBRA claims of former Employees.  Igoe charges the Debtors an administration fee (the "Igoe Administration Fees, and together with the Payroll Processing Fees, the "Wage and Benefits Processing Fees") each month.  The average monthly amount of the Igoe Administration Fees is approximately $1,000, which are paid in arrears.  As of the Petition Date, the Debtors estimate that they have $2,000 in Igoe Administration Fees.

**Withholding Obligations.**

During each applicable pay period, federal, state and foreign laws require the Debtors to withhold certain amounts related to federal, state, and local income taxes, Medicare taxes and Social Security (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, provincial or local taxing authority.  The Debtors must then match Employee Payroll Taxes and pay, from their own account, certain amounts for Social Security, Medicare taxes, federal and state unemployment insurance, and certain other taxes (the "Employer Payroll Taxes" and, together with the Employee Payroll Taxes, the "Payroll Taxes").  The majority of Payroll Taxes are processed and forwarded to the appropriate federal, state, or local taxing authority within a few days of when Employees' payroll checks are disbursed, on a bi-weekly basis—the week after payroll—in accordance with applicable state, provincial, and local taxing authority requirements.  The Debtors historical average Payroll Taxes are approximately $1.7 million per month.

In addition, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, garnishments, levies, child support and related fees, and pre-tax deductions payable pursuant to certain of the Employee Benefit Programs (as defined below), such as an Employee's share of healthcare benefits and insurance premiums, 401(a) and 403(b) contributions, legally ordered deductions, and miscellaneous deductions (collectively, the "Deductions" and together with the Payroll Taxes, the "Withholding Obligations"), and forward such amounts to various third-party recipients.

As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unremitted Withholding Obligations is approximately $750,000, all of which is expected to come due during the Interim Period.

**Unemployment Obligations.**

Beverly Hospital, like other employers in California, provide unemployment benefits to workers who have lost their job and meet the eligibility requirements established by the State of California's Employment Development Department ("EDD"). The hospital's share of those obligations historically billed by EDD in arrears and on a quarterly basis; the Debtors' third party unemployment claims processor, Equifax, additionally invoices the Debtors $2,000 in processing fees on a monthly basis (collectively, the "Unemployment Obligations").

As of the Petition Date, the Debtors have approximately $25,000 due and owing on Unemployment Obligations prepetition.

**Reimbursable Expenses.**

The Debtors customarily reimburse certain Employees (including members of the board of directors) for certain expenses incurred in the scope of their duties (the "Reimbursable Expenses"). Reimbursable Expenses are typically associated with travel, transportation, lodging, and meals incurred in connection with medical-related education travel, and certain other work-related expenses. It would be inequitable to require the Employees to personally bear these expenses, all of which were incurred on behalf of, and for the benefit of, the Debtors with the expectation of prompt reimbursement. By this Motion, the Debtors seek authority, but not direction, to continue

Exhibit B to First Day
Declaration

and pay amounts relating to Reimbursable Expenses, including unpaid amounts owed on account of Reimbursable Expenses incurred through Employees' personal funds. It is the policy of the Debtors to reimburse Employees for valid business expenses after submission of appropriate documentation to the Debtors' accounting department and approval thereof on a monthly basis. Reimbursable Expenses typically include, but are not limited to, cell phone charges, mileage, and other certain business-related expenses that were not paid directly by the company. The Debtors pay approximately $5,000 on a monthly basis on account of the Reimbursable Expenses.

It is difficult for the Debtors to determine the exact amounts of Reimbursable Expenses that are due and owing for any particular time period since the expenses incurred by Employees on behalf of the Debtors throughout the year vary on a monthly basis and because there may be some delay between when an Employee incurs an expense and submits the corresponding expense report for processing. As of the Petition Date, based on historical experience and past practice, the Debtors estimate that the amount of accrued but unpaid obligations owed to Employees is approximately $10,000 on account of Reimbursable Expenses.

**Employee Benefit Programs.**

In the ordinary course of business, the Debtors have established various benefit plans and policies for their full-time Employees (collectively, the "Employee Benefits"). The Employee Benefits include (a) the PTO Plans (as defined below); (b) the Medical Plans, the Prescription Drug Plan, the Dental Plan, the Vision Plan, the Life Insurance Program, the MERP and the Other Health Benefits (each as defined below, and collectively, the "Health Plans"); (c) 401(a) plan benefits, 403(b) plan benefits, and 457(b) plan retirement benefits (collectively the "Retirement Plans") and (d) workers' compensation liability insurance ("Workers' Compensation Program").

I believe that failure to continue the Employee Benefits would severely undermine the Employees' morale and result in significant hardship to the Employees.

Exhibit B to First Day
                    Declaration

**PTO / Sick Leave Reserve / Paid Sick Leave / Bereavement Leave / Jury Duty.**

All of the Debtors' fulltime and part-time Employees are eligible to accrue paid leave or paid time-off ("PTO").  Approved uses of employee PTO include vacation, sick days or personal days.  Accrued and unused PTO is carried forward to the following year, subject to a 300 hour cap per Employee and a 400 hour cap for administrators and directors.  Employees earn 0.09231 hours of PTO for each regular hour worked if they have been employed less than five years, 0.11154 PTO hours per hour worked if employed between five to ten years, and 0.13077 PTO hours per hour worked if employed for ten years or more.

In addition to PTO, all of the Debtors' fulltime and part-time Employees are eligible to accrue paid sick leave reserve ("SLR") in the amount of 0.02308 hours per regular hour worked, and up to 48 hours a year.  Per-diem employees are eligible to accrue paid sick leave ("PSL") in the amount of 1 hour per 30 hours worked, and up to 24 hours per year.  Full-time employees are additionally eligible for five days of paid jury duty.  Lastly, the Debtors' fulltime Employees are eligible for 24 hours of bereavement leave ("Bereavement Leave," and together with PTO SLR, jury duty, and PSL, the "PTO Plans") and part-time Employees 14 hours of Bereavement Leave.

As of the Petition Date, the Debtors estimate that they carry approximately $3.6 million on their books for accrued and unused PTO hours.  This amount, however, is not a current cash payment obligation.

**Health Plans.**

The Debtors offer self-insured medical insurance coverage to their eligible fulltime and part-time Employees and their dependents administered through Anthem Blue Cross (the "Medical Plan").  On average, the Debtors fund approximately 82% of the monthly costs associated with the medical coverage, and employee deductions fund approximately 18% of the monthly costs.  The Debtors' monthly costs for the Medical Plan over the last 12 months range as low as $400,000 to as high as $1.2 million—prior to stop loss coverage—as the cost fluctuates based on Employees' usage of medical services that month.

Based on more recent historical claims trends, the Debtors estimate that approximately $500,000 remains outstanding as of the Petition Date.

Fulltime and part-time Employees are also eligible for pharmacy drug coverage through several program options through Keenan Pharmacy Program, Express Scripts, and Sav-On (the "Prescription Drug Plans").

As of the Petition Date, the Debtors have approximately $83,000 accrued on account of prepetition expenses under the Prescription Drug Plans.

### Dental Plans.

Fulltime and part-time Employees are also eligible for dental coverage through two different providers.  Employees can elect self-insured dental coverage through Delta Dental.  The Debtors historically fund approximately $32,000 of monthly costs associated with the plan for Delta Dental coverage.

Alternatively, Employees can choose a premium-paid HMO provider plan through DeltaCare USA (with the Delta Dental plan, the "Dental Plans").  On average, the Debtors fund approximately $2,000 of monthly costs associated with DeltaCare coverage.  The total cost of the Dental Plans is approximately $34,000 per month.

As of the Petition Date, the Debtors have approximately $22,000 accrued on account of prepetition expenses on the Dental Plans.

### Vision.

The Debtors also offer fulltime and part-time Employees the option of participating in a vision insurance plan administered by VSP (the "Vision Plan").  The total cost of the Vision Plan is approximately $4,700 per month.  As of the Petition Date, the Debtors estimate that they have $4,000 in accrued and owing amounts on account of the Vision Plan.

### Life Insurance.

Additionally, the Debtors offer eligible members of the workforce basic group term life insurance and accidental death and dismemberment coverage (collectively, the "Life Insurance Program").  For fulltime Employees, coverage is in an amount equal to that Employee's annual

base salary up to a maximum of $100,000; the coverage level for medical directors is equal to 1.5 times annual base salary up to $330,000; for hospital executives it is 2 times annual base salary up to $400,000. The Life Insurance Program is offered at no cost to them through Reliance Standard.

The Debtors' average monthly premium over the last twelve-month period for this coverage is approximately $9,000. As of the Petition Date, there is approximately $12,000 in prepetition premiums payable on account of the Life Insurance Program.

### Medical Expense Reimbursement Plan.

The Debtors offer to their eligible Employees the opportunity to participate in a medical expense reimbursement plan (the "MERP"). Under the MERP, the Debtors reimburse Employees for eligible health care expenses that are incurred under an alternate group health coverage, typically that offered by a spouse's employer. Eligible expenses include copays, deductibles, and coinsurance up to $7,359 each year for an Employee and $14,700 for a family. As of the Petition Date, there is approximately $5,000 in prepetition expense reimbursements on account of the MERP.

### Other Health Benefits.

The Debtors also offer their eligible Employees certain other health benefits, including but not limited to, a flexible savings account, shortterm disability, longterm disability, universal life insurance with long term care, critical illness/cancer coverage, and accident insurance (collectively the "Other Health Benefits").

As of the Petition Date, the Debtors do not believe that any amounts are due and owing for the prepetition period on account of Other Health Benefits.

### Health Plan Administration Fees.

The Debtors utilize the services of a third-party administrator, Keenan and Associates ("Keenan"), to administer and process claims under the Health Plans. Based on information provided to Keenan by Anthem Blue Cross on medical service usage, Keenan submits a claims invoice each week to the Debtors for reimbursement for medical services rendered through the plan. On a monthly basis, Keenan also invoices the Debtors for the payment of its administration

fees and stop loss fees, the latter of which are then remitted to a stop loss insurer (the "Health Plan Administration Fees"). The average monthly amount of the Health Plan Administration Fees is approximately $87,000, which also includes a monthly fee for providing third party administration of all the Health Plans.

**Supplemental Retirement Program and Automobile Stipend.**

The Debtors also maintain a supplemental executive retirement plan and a split-life insurance plan for executives (collectively, the "Supplemental Retirement Program"). As of the Petition Date, only one executive participates in the Supplemental Retirement Program.

As of the Petition Date, the Debtors do not believe they owe any amounts on account of Supplemental Retirement Program.

Certain salaried Employees, including Insiders, are eligible for a car allowance to offset the expense of commuting to Beverly Hospital (the "Automobile Stipend"). This benefit amounts to $6,000 a year per eligible Employee, disbursed on a biweekly basis. Approximately nine insider Employees receive the Automobile Stipend. As of the Petition Date, the Debtors owe approximately $4,500 amount on account of the Automobile Stipend.

Pursuant to the Wages Motion, I understand that the Debtors only seek authority, not the direction, to pay the Automobile Stipend provided that no objections to the Notices are received within the 15-day time period provided by the U.S. Trustee Guidelines.

**DHCS Retention Payment Program.**

On March 27, 2023, Beverly Hospital received $815,427 from the California Department of Health Care Services ("DHCS") as part of DHCS' Hospital & Skilled Nursing Facility Worker and Physician Retention Payment Program ("DHCS Retention Program"). Approximately 625 Employees are eligible to receive bonuses of up to $1,500. Pursuant to the terms of the DHCS Retention Program, employers who received funds through are required to disburse the funds within 60 of receipt, and then must submit an attestation no later than 90 days from receipt.

    i.        **Other Benefits.**

The Debtors offer their eligible Employees certain other benefits, including but not limited to tuition reimbursement for job-related educational expenses in the amount of $3,000 per year for fulltime Employees and $1,500 for part-time Employees once an Employee has been employed for six months; FlexEd online education reimbursement; a cell phone stipend for eligible Employees; pet insurance, and reimbursement for nurse licensing (collectively the "Other Benefits").

Historically, the Debtors fund approximately $14,000 a month on Other Benefits for its Employees. Based on this, the Debtors believe there is approximately $12,000 in prepetition Other Benefits.

**ii.    Retirement Plans.**

The Debtors offer Employees the opportunity to participate in various retirement plans, including three defined contributions plans funded by employee pre-tax payroll deferrals: a 401(a) plan, 403(b) plan, and a 457(b) plan (together, the "Retirement Plans"), each of which are administered though Transamerica Retirement Solutions (both are held at Transamerica) ("TRS"). Employees participating in these programs may contribute up to the federal statutory cap per year.

Each pay period, based on the data provided by the Debtors, TRS deducts specified amounts from certain of the Employees' gross Wages to pay for the Employee's contributions into the Retirement Plans.  The Debtors provide matching contributions to the 403(b) plan of 25 cents per dollar, and up to 3% of the Employee's annual salary.   The Debtors' average monthly obligation over the last twelve-month period for the 403(b) plan was $30,000.

Failure to timely forward the Employees' Retirement Plan deductions may be a violation of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), resulting in potential personal liability for the Debtors' officers for such deducted amounts.  I believe that maintaining the Retirement Plans is critical to maintaining Employee morale. Furthermore, certain of these retirement benefits are required by a CBA.

As of the Petition Date, the Debtors have $21,000 in accrued prepetition matching obligations.

Exhibit B to First Day
Declaration

**B.**    **Workers' Compensation Program.**[87]

44.    The Debtors maintain workers' compensation liability insurance to provide the Employees with workers' compensation coverage for claims arising from or related to their Employment ("Workers' Compensation Obligations").    The Debtors provide workers' compensation benefits to the Employees through a high deductible insurance plan with Safety National Casualty Corporation.  The Debtors' annual premium for the Safety National policy is approximately $377,610, plus a state surcharge of $50,350.  Premiums are payable in the form of a down payment with subsequent monthly installments and are subject to an annual audit.  As of the Petition Date, there are eight installment payments remaining for the policy period in an aggregate amount of approximately $285,000.

Workers' compensation claims are administered by Keenan, which charges the Debtors certain administration fees on a monthly or quarterly basis.  On average, the annual amount of administration fees paid to Keenan is approximately $103,000 (the "Workers' Compensation Administration Fee").  The Debtors additionally maintain three trust accounts to fund workers' compensation claims.[8]

As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations owed is approximately $60,000 on account of Workers' Compensation Obligations.

I believe that failure to maintain workers' compensation insurance could result in the institution of administrative or legal proceedings and material fines against the Debtors and their officers and directors.

For the foregoing reasons, I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable

---

[7]    Concurrently herewith, the Debtors have filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtors to Maintain, Renew, or Supplement their Insurance Policies and Honor All Obligations In Respect Thereof, and (II) Granting Related Relief* (the "Insurance Motion"). The Debtors are not seeking relief related to workers' compensation programs in the Insurance Motion.

[8]    A detailed description of these accounts is set forth in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Maintain Existing Business Forms, and (C) Perform Intercompany Transactions, and (II) Granting Related Relief*, filed concurrently herewith.

SMRH:4873-9625-8392                                                 Exhibit B to First Day
Declaration

the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be granted.

**V.    Debtors' Emergency Motion for Entry of an Order (i) Authorizing the Implementation of Procedures to Protect Confidential Patient Information, and (ii) Granting Related Relief (the "<u>Patient Confidentiality Procedures Motion</u>").**

Pursuant to the Patient Confidentiality Procedures Motion, the Debtors seek entry of an order: (a) authorizing the implementation of procedures to protect confidential patient information as set forth herein, and (b) granting related relief. Specifically, the Debtors request that Kurtzman Carson Consultants LLC ("<u>KCC</u>"), the proposed claims agent in these chapter 11 cases (the "Claims Agent") be allowed to prepare, pursuant to section 521(a)(1)(A) and Bankruptcy Rule 1007(a)(1), a separate creditor matrix of the Patients (the "<u>Patient Matrix</u>") and, pursuant to section 521(a)(1)(B)(i) and Bankruptcy Rule 1007(b)(1)(A), separate schedules of claims that may be asserted by and against the Patients (the "<u>Patient Schedules</u>"). The Debtors request that the Claims Agent not be required to file the Patient Matrix or the Patient Schedules with this Court but that the Claims Agent be allowed to file a redacted version of the Patient Schedules that specifically redacts the names and addresses of the Patients; provided, however, that the Patient Matrix and the Patient Schedules may be reviewed by (a) this Court, (b) the U.S. Trustee for the Central District of California (the "<u>U.S. Trustee</u>"), (c) any applicable state regulatory agency (through the respective state attorney general), and (d) any other party in interest that obtains, after notice and a hearing, authorization from this Court.

The Debtors believe that the requirements to maintain patient confidentiality under HIPAA conflict with the requirements to disclose information under the Bankruptcy Code, specifically the duty to file a list of all creditors under section 521(a)(1)(A) and the duty to file schedules of all assets and liabilities under section 521(a)(1)(B)(i). The Debtors therefore request that such patient information be protected pursuant to section 107(c), which allows a bankruptcy court, for cause, to protect an individual if disclosure would create an undue risk of unlawful injury. The Debtors believe that the relief requested herein balances the need to maintain confidential patient information under HIPAA with the need for disclosure under the Bankruptcy Code.

Exhibit B to First Day
Declaration

I believe that the relief requested in the Patient Confidentiality Procedures Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**VI.    Debtors' Emergency Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to Honor Prepetition Obligations to (a) Lien Claimants, (b) 503(b)(9) Claimants, and (c) Critical Vendors; and (ii) Granting Related Relief (the "<u>Trade Claims Motion</u>").**

Pursuant to the Trade Claims Motion, the Debtors seek entry of interim and final order: (a) authorizing the Debtors to honor prepetition obligations to (i) lien claimants, (ii) 503(b)(9) claimants, and (iii) critical vendors; and (b) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within 21 days of the commencement of these chapter 11 cases to consider approval of the Wages Motion on a final basis.

As hospital operators and healthcare providers, the Debtors operate in one of the most heavily regulated and closely scrutinized industries in the country.  Moreover, as the operator of a hospital licensed under California state law and certified to participate in the Medicare and Medi-Cal programs, local, state, and federal laws and regulations place certain compliance requirements on the Debtors.  Maintaining compliance with these extensive, comprehensive regulations and requirements necessitates continued, uninterrupted access to essential goods and services.

The Debtors submit that the requested relief in the Trade Claims Motion will allow the Debtors to preserve the viability of Beverly Hospital by paying the prepetition claims of certain counterparties that are critical to Beverly Hospital's operations and specifically patient care.  In framing the relief requested herein, the Debtors have categorized the prepetition claims they seek authorization to pay into the following three groups: (a) claims of creditors that may be able to assert liens against the Debtors' assets (the "<u>Lien Claimants</u>"); (b) claims that may entitle a vendor or supplier to administrative expense priority under section 503(b)(9) of the Bankruptcy Code (the "<u>503(b)(9) Claimants</u>"); and (c) claims of certain critical vendors without whom the Debtors could not effectively or efficiently conduct their business and provide services to their customers and who meet a set of specific criteria as outlined below (the "<u>Critical Vendors</u>").  By the Trade Claims Motion, the Debtors are only seeking authority to pay only those claims that they have deemed

necessary, in their business judgment and in their sole discretion, to continue providing patient care services that are vital to the communities the Debtors serve, to preserve the value of their estates, and to maintain compliance with applicable laws, regulations, and licenses governing hospital operations (collectively, the "Trade Claims").

The Debtors and their advisors have engaged in an extensive process of reviewing and analyzing the Debtors' books and records, consulting operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practices to identify business relationships—which, if lost, could materially harm the Debtors' patients, the Debtors' businesses, reduce their enterprise value, and/or impair their restructuring process—all in an effort to identify only those most critical vendors using their business judgment.

As of the Petition Date, the Debtors estimate that they owe approximately $350,000 on account of the Lien Claims, all of which are past due or will come due in the first twenty-one days after the Petition Date.  To continue benefitting from the Lien Claimants' goods and services, the Debtors request authority to pay the Lien Claims as they become due and payable and to continue paying the Lien Claims in the ordinary course of business.

The estimated amounts owing to the 503(b)(9) Claimants set forth below pales in comparison to the potential damage to the Hospital if the Hospital's operations were to experience significant disruption.  As of the Petition Date, the Debtors estimate that they owe approximately $350,000 on account of goods delivered within the twenty days immediately preceding the Petition Date, a significant portion of which is past due or will come due in the first twenty-one days after the Petition Date, and the value of which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.  Accordingly, the Debtors request the authority, but not direction, to pay the undisputed 503(b)(9) Claims as and when they come due in the ordinary course of business.

As of the Petition Date, the Debtors owe approximately $17,500,000 on account of all accounts payable to the Debtors' trade creditors. By this Motion, the Debtors are only seeking

authority to pay an amount that they have deemed necessary, in their business judgment and in their sole discretion, to preserve the value of their estates, which shall not exceed $600,000 on an interim basis and $2,000,000 on a final basis on account of prepetition claims held by certain Critical Vendors and accrued in the ordinary course of business (the "Critical Vendor Cap"). The Debtors' will use commercially reasonable efforts to require the vendor to sign a postpetition agreement with normalized terms and conditions that contractually bind the vendor to continue providing essential goods and services postpetition (the "Critical Vendor Agreement").

Subject to the Court's approval, the Debtors intend to pay Trade Claims only to the extent necessary to preserve their businesses. The Debtors have designated a core group of executives, advisors, and employees who have experience in the Debtors' businesses and in the reorganization process to review, assess, and potentially recommend any payment on account of a Trade Claim. In return for paying the Trade Claims, the Debtors will use commercially reasonable efforts to condition payment of the Trade Claims upon each vendor's agreement to, as applicable, continue supplying goods and services on terms that were in place in the 120 days prior to the Petition Date or are otherwise acceptable to the Debtors in light of customary industry practices (the "Customary Trade Terms").

I believe that the relief requested in the Trade Claims Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

## VII. Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to Obtain Postpetition Financing, (ii) Granting Adequate Protection to the Prepetition Secured Parties, and (iii) Granting Related Relief (the "DIP Motion").

The Debtors seek entry of an interim order: (a) authorizing the Debtors to incur the DIP Facility; (b) granting liens and providing superpriority administrative expense status to the DIP Lender; (c) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Orders; and (d) granting related relief.

SMRH:4873-9625-8392                                                    Exhibit B to First Day
                                        Declaration

Pursuant to the DIP Motion, the Debtors are seeking approval of the DIP Facility in an amount not to exceed $6,000,000 in the interim period and up to $13,000,000 total.

The Debtors' payor mix, heavily weighted to Medi-Cal and Medicare, unfortunately has not provided the necessary cash flow. Even with the proposed expedited term of these Cases, however, such financing is critical to the Debtors' operation and their ability to preserve the value of the assets pending the auction and approval of a sale. The proposed financing under the DIP Facility is needed to maintain an appropriate level of liquidity and help fund the Debtors' day-to-day operations and patient care. The alternative is the loss of the community's hospital.

During these Cases, the Debtors require sufficient liquidity to fund general corporate requirements for essential, day-to-day operations to ensure continuity of patient care, and to preserve the value of the Debtors' assets. Not to mention, preserving the value of the Prepetition Collateral. The Debtors also need additional cash to fund the formal reorganization and sales processes, all in accordance with the DIP Budget for the benefit of all stakeholders, including the Prepetition Secured Creditors.

The Debtors require the immediate use of the DIP Facility and other income generated from their commercial activities in order to maintain the quality of patient care and the day-to-day business operations. It is critical that the Debtors have the initial $6,000,000 of the DIP Facility in place on an interim basis in order to ensure that the Debtors have enough cash to maintain patient care services and to maintain their healthcare and to assure adequate trade credit to prevent accelerating cash losses during operation. Absent such relief from the Court, the Debtors will not have sufficient liquidity to ensure uninterrupted hospital and patient care operations and will suffer an extreme loss of asset value to the detriment of all stakeholders. It is also important that the Debtors demonstrate to their staff, vendors, and patients that the Hospital will continue to provide high quality patient care, and to function without interruption and that the Debtors will continue to pay vendors in the ordinary course of business. Without such a demonstration—and in the event of any interruption or delay in the business—the Debtors' patients could suffer and employees

may very well seek other employment opportunities with competitors, thereby crippling the Debtors' business and hope for a value-maximizing reorganization.

Further evidentiary support for the DIP Motion in contained in the *Declaration of Jason Cohen in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Secured Parties, and (III) Granting Related Relief* and the *Declaration of Alyssa Lozynski in Support of Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to Prepetition Secured Creditors, and (III) Granting Related Relief* filed contemporaneously herewith.

## VIII.    Debtors' Emergency Motion for Entry of an Order (i) Authorizing the Debtors to Maintain, Administer, Modify, and Renew Their Refund Programs and Practices and Honor Obligations Related Thereto, and (ii) Granting Related Relief (the "<u>Refund Programs Motion</u>").

Pursuant to the Refund Programs Motion, the Debtors seek entry of an order:   (a) authorizing the Debtors to maintain, administer, modify, and renew their refund programs and practices and honor obligations related thereto; and (b) granting related relief.

In the ordinary course of business, the Debtors refund patients and third-party payors when overpayments are identified.  These third-party payors include healthcare insurers, managed care organizations, workers' compensation programs, contract management services, private pay sources, Medicare and Medicaid, and capitation accounts (collectively, the "<u>Third-Party Payors</u>"). The Debtors routinely issue refunds or are subject to offsets or recoupments for reimbursement of overpayments made by or on behalf of patients and Third-Party Payors resulting from the interaction between the Debtors' billing procedures, patient medical insurance deductibles and third-party payments (the "<u>Refund Programs</u>").

The case-by-case nature of the Debtors' medical services makes the process of determining each patient's insurance coverage particularly complex.  As a result, whether due to data input errors during claims processing or overpayments arising from coordination of benefits issues among multiple insurers, patient accounts—once fully processed—may contain credit balances.

SMRH:4873-9625-8392

Once the Debtors receive payments from patients or insurers, the Debtors review accounts that have credit balances and, if appropriate, refund any surplus to the patient or the applicable Third-Party Payor to address any overpayments.

When the Debtors discover and verify an overpayment from a patient or Third-Party Payor, the amount of the overpayment is reviewed in the Debtors' billing system, which then administers refunds to the patient as appropriate. Offsets by Third-Party Payors are reconciled by the Debtors after the offset occurs. There is typically a significant lag between when the patient is treated, when the overpayment is recognized or determined, and when the overpayment is reviewed in the Debtors' billing system. After the overpayment amount is determined, either the Debtors issue a check or other form of payment to the patient or Third-Party Payor, or the Third-Party Payor will offset future payments in the amount of the overpayment.

At any given time, it is difficult to determine the amount of outstanding overpayments that have been identified and made but have not yet been issued a refund check or offset. Moreover, some refund checks issued to patients or Third-Party Payors before the Petition Date may not have been presented for payment or may not have cleared the Debtors' banking system or accounting system, and accordingly, have not been honored and paid as of the Petition Date. Moreover, the Debtors are required, under various state and federal laws, to reimburse patients and Third-Party Payors as overpayments are identified.

Therefore, by the Refund Programs Motion, the Debtors request authority to continue to issue and pay and allow offsets for the Refund Programs to patients and Third-Party Payors on a postpetition basis, including refunds for overpayments made prepetition or resulting from prepetition services in the ordinary course of business.

I believe that the relief requested in the Refund Programs Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

IX.    **Debtors' Emergency Motion for Entry of an Order (i) Limiting the Scope of Notice and (ii) Granting Related Relief (the "Motion to Limit Notice").**

Pursuant to the Motion to Limit Notice, the Debtors seek entry of an order: (a) limiting service of certain notices of hearings, applications, motions, stipulations, and other matters as the Court may direct on (i) the Debtors, (ii) counsel to the Debtors, (iii) the United States Trustee, (iv) counsel for any committee appointed under Bankruptcy Code section 1102 or, before and until the appointment of any such committee, the Debtor's thirty (30) largest unsecured creditors, (v) any party directly affected by a particular motion, and (vi) all other parties who file a request for special notice and service of papers with the clerk of this Court; and (b) granting related relief.

Given that these chapter 11 cases are large, complex, and involve hundreds of creditors and parties in interest, many of whom will have multiple concerns that may result in the filing of numerous pleadings, notices pursuant to Bankruptcy Rule 2002, and requests for service that could very well lead to numerous, fragmented hearings. The costs and burdens associated with multiple hearings per month, plus the costs associated with copying, mailing, overnighting, or otherwise serving paper copies of all filings, will impose economic and administrative burdens on the Debtors' estates, the Court, and all other parties in interest. Moreover, constant mass mailings will require the Debtors and their advisors to divert their limited resources away from reorganizing their business.

As contemplated by the Limited Notice Procedures, by directing that certain notices be mailed only to recipients named on a shortened mailing list and those creditors that file a request with the Court to receive such notices, all parties in interest will be assured of receiving appropriate notice of matters affecting their interests and ample opportunity to prepare for and respond to such matters. Further, a shortened mailing list will significantly reduce the substantial administrative and financial burden that would otherwise be placed on the Debtors' estates and other parties in interest that file documents in these chapter 11 cases.

Finally, the Debtors' proposed notice and claims agent, Kurtzman Carson Consultants LLC, intends to establish a case website available at https://www.kccllc.net/Beverly where, among other things, electronic copies of all pleadings filed in these chapter 11 cases will be posted as soon

SMRH:4873-9625-8392

Exhibit B to First Day
Declaration

as practicable, but in any event within three business days of filing, and may be viewed free of charge.

I believe that the relief requested in the Motion to Limit Notice is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will substantially reduce administrative burdens and result in substantial cost savings to the Debtors' estates because of the reduction of time and money the Debtors will have to expend.  Pursuant to the Limited Notice Procedures, all parties in interest that may be directly affected by a request for relief, response, objection, or adversary proceeding filed with the Court will receive notice thereof directly from the entity submitting such documents to the Court well in advance of the relevant hearing.  Thus, no party in interest will be adversely affected.

The establishment of the Limited Notice Procedures will promote the efficient and orderly administration of these chapter 11 cases.  Indeed, authorizing the Debtors to serve their documents on a limited mailing matrix will ease the administrative and economic burdens on the Court and the Debtors' estates.  Additionally, parties in interest will still have the opportunity to bring true emergency matters before the Court on an expedited basis pursuant to the Local Bankruptcy Rules and the Limited Notice Procedures.  Accordingly, I respectfully submit that the Motion to Limit Notice should be approved.

**X.**     **Notice of Motion and Motion for Order (A) Extending Time for Debtors to File Schedules and Statements, (B) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing List of Creditors for Each Debtor, (C) Authorizing the Debtors to File a Consolidated List of Top Thirty Largest Creditors, (D) Authorizing the Debtors to Redact Certain Personal Identification, and (E) Related Relief; Declaration of Alice Cheng in Support Thereof (the "Schedules Extension Motion")**

I understand that absent an extension of time, the Debtors must file their Schedules of Assets and Liabilities, Statement of Financial Affairs, and related materials (collectively, the "Schedules") no later than fourteen (14) days after the Petition Date.

Pursuant to the Schedules Extension Motion, the Debtors seek entry of an order: (a) extending the deadline by which the Debtors must file their Schedules by 21 days, for a total of 35 days from the Petition Date, without prejudice to the Debtors' ability to request additional

extension for cause shown; (b) authorizing the Debtors to file a consolidated list of creditors in lieu of submitting a separate Master Mailing List of creditors for each Debtor; (c) authorizing the Debtors to file a consolidated list of the Debtors' 30 largest unsecured creditors in lieu of filing lists for each Debtor; (d) authorizing the Debtors to redact certain personal identification information; and (e) granting related relief.

*Extending Deadline By Which the Debtors Must File Schedules and Statements.*  To prepare the Schedules, the Debtors must compile information from books, records, and documents relating to the claims of thousands of creditors, as well as the Debtors' many assets, contracts, and leases.  This information is voluminous and located in numerous places throughout the Debtors' organization.  I understand that collecting the necessary information requires an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term—when I believe these resources would be best used to stabilize the Debtors' business operations, and most critically, continue to provide patients with quality healthcare services.

Although the Debtors, with the assistance of their professional advisors, are working diligently and expeditiously to prepare the Schedules, the Debtors' resources are strained. Considering the amount of work entailed in completing the Schedules combined with the competing demands on the Debtors' employees and professionals to assist in efforts to stabilize business operations during the initial postpetition period, I believe that the Debtors likely will not be able to properly and accurately complete the Schedules within the required time period.

Prior to the filing of these chapter 11 cases, the Debtors focused on preparing for the chapter 11 filing, preparing the business to transition into chapter 11, and negotiating with the proposed DIP lenders and other constituencies.  Such efforts made it difficult for the Debtors to prepare the Schedules.  I anticipate that the Debtors may require at least 35 days after the Petition Date to complete the Schedules.

I respectfully submit that the extensive amount of information that must be assembled and compiled, the multiple places where the information is located, and the hundreds of employee and

-40-

professional hours required to complete the Schedules constitute good and sufficient cause for granting the requested extension of time.

*Consolidated Master Mailing List of Creditors.* Although I understand that a list of creditors usually is filed on a debtor-by-debtor basis, there are thousands of creditors and parties in interest in these chapter 11 cases. The Debtors maintain lists of the names and addresses of all such entities on various computer software programs that permit the Debtors, or a third-party service provider on the Debtors' behalf, to print mailing labels for each such entity. Additionally, the Debtors have sought to retain KCC as the Debtors' claims and noticing agent in these chapter 11 cases. KCC and the Debtors will maintain the Master Mailing List in the format required by Local Bankruptcy Rules; however, filing a mailing list of creditors for each Debtor will create a substantial administrative burden for the estates.

*Consolidated List of the 30 Largest Unsecured Creditors.* The Debtors request authority to file a single, consolidated list containing the name, address and claim of their 30 largest general unsecured creditors, excluding insiders. Here, compiling separate top creditor lists for each individual Debtor would consume an excessive amount of the Debtors' time and resources, and filing a consolidated list would more appropriately reflect the liabilities against the Debtors' operations on an organization level. I believe this will also help alleviate administrative burdens, costs, and the possibility of duplicative service, and will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous list of creditors.

*Redact Personal Identifying Information.* The Debtors request authority to redact the individuals' mailing addresses to protect this personally identifying information. I believe this relief is necessary to protect the identity of individual creditors, patients, employees, and equity interest owners from the dangers of identity theft and other safety concern.

## XI.   Expedited Emergency Relief Is Necessary.

On the Petition Date, the Debtors filed the First Day Motions to be heard by this Court on an expedited basis. I believe that prompt entry of the relief requested in the First Day Motions is

critical to maintaining the Debtors' ongoing operations and the value of their bankruptcy estates. An expedited hearing on the First Day Motions is appropriate under these circumstances and is consistent with past practices in virtually every significant chapter 11 case, where various relief is required at the outset of the case to ensure a smooth transition into chapter 11 and effectuate applicable and appropriate progress with respect to the Debtors' restructuring timeframe. The relief sought in the First Day Motions is essential to avoid substantial disruption to the normal operations of the Debtors' business and allow the Debtors' to meet their restructuring goals.

I believe that the relief requested in the First Day Motions is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, I respectfully submit that the First Day Motions be heard on an emergency basis.

*[Remainder of page intentionally left blank]*

SMRH:4873-9625-8392

Exhibit B to First Day
Declaration